IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35297-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHAD GERRIT BENNETT, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Chad Bennett appeals his 2017 conviction and 660-month exceptional sentence for the second degree intentional murder of his 82-year-old landlord, Lucille Moore. We find no prejudicial error and affirm.

FACTS AND PROCEDURE

Lucille Moore owned and rented out several homes in her Ephrata neighborhood. In late July 2014, she rented a house to Chad Bennett, then age 24, and married with four children. Mr. Bennett was employed as a farm worker for C & C Farms, owned by the Cobb family.

On September 7, 2014, Mr. Bennett went to Ms. Moore's house to pay his rent. According to Bennett, he was there three times that day: first at around 12:30 p.m. to pay

rent, second to pay the remainder of his deposit, and third at around 1:00 p.m. to retrieve his wallet, which he had inadvertently left behind.

On the morning of September 8, 2014, Moore's neighbor, Joyce Andersen, found Ms. Moore lying on the floor with a pillow over her face and her shirt soaked with blood. Ms. Andersen called police, who saw a slash across Moore's throat and confirmed she was dead. Forensic pathologist Dr. Eric Kiesel later determined Moore had sustained multiple significant head injuries, was likely manually strangled, had received two shallow cuts and a stab wound to her neck, and was stabbed 17 times in her chest, 11 of which penetrated her heart.

Detective Todd Hufman was the lead detective. He set forth details of his investigation in a probable cause statement. Hufman enlisted the Washington State Patrol (WSP) Crime Scene Response Team (CSRT) to help process the scene. CRST's team leader, forensic scientist Trevor Allen, worked with Hufman to prioritize collection of items that could contain deoxyribonucleic acid (DNA) evidence. Among those items sent for testing were the blood-stained pillow, a swab of a bloodstain located on a kitchen cabinet door, and a cigarette butt found on the floor near Moore's body.

Ms. Andersen told investigators she had last seen Moore on Saturday, September 6, around 7:30 p.m. Moore's daughter, Wendy Swain, reported last speaking to her

2

September 6, around 2:30 p.m. Moore's pastor confirmed she had attended Sunday church services on September 7, from 9:00-10:15 a.m. Moore declined a lunch date with Ms. Andersen that day, saying she needed to be at her house around 12:30 p.m. because her tenants from 106 G Street NE (Chad and Trisha Bennett) were coming over to pay their delinquent rent.

Detective Hufman contacted Chad Bennett. Bennett said he went to Moore's residence on Sunday, September 7, between noon and 1:00 p.m. and paid his rent. In later interviews, Bennett told Hufman he had been to Moore's house three times after 10:30 a.m. that day—first to pay rent, second to pay money still owing on the deposit, and third to retrieve his wallet after Moore called and told him that he had left it. He also gave various descriptions of his activities and whereabouts throughout that day. Bennett agreed to give a DNA sample. Ultimately, investigators determined Bennett was the last known person to have seen Moore alive on September 7.

WSP Crime Laboratory forensic scientist Anna Wilson reported DNA test findings on November 21, 2014. DNA matching Chad Bennett's was present on the cigarette butt, with a 1 in 1.1 sextillion probability of selecting an unrelated individual at random with a matching profile. The bloodstain swab from the kitchen cabinet matched Bennett's Y-STR DNA typing profile. Neither he nor any of his paternal male relatives could be

excluded as a donor. The profile is not expected to occur more frequently than 1 in 8,600 males in the United States population. One area of the pillow contained a mixture of three male individuals, with the major contributor matching Bennett's Y-STR DNA typing profile. Again, neither he nor any of his paternal male relatives could be excluded as a donor, and the profile is not expected to occur more frequently than 1 in 8,600 males in the United States population. A second area on the top side of the pillow contained two DNA profiles, one from the victim. The other profile matched Bennett's DNA, with an estimated 1 in 50 billion probability of selecting an unrelated individual at random from the United States population with a matching profile.

Bennett was arrested on November 25, 2014, and charged with first degree murder.

On December 16, 2014, the court entered an omnibus order directing the State to provide the defense with "[a]ll photographs, police reports, lab reports, witness statements, audio and video recordings and State's witness list . . . by December 29, 2014." Clerk's Papers (CP) at 2245. Trial was originally set for January 22, 2015, but was continued several times throughout 2015 and into the first half of 2016.

Meanwhile, on December 2, 2014, Detective Hufman began receiving recordings of Bennett's jail calls. A recorded message at the beginning of each call informed the

persons on the line that the call was subject to recording and monitoring. Hufman

eventually accumulated more than 250 hours of Bennett's recorded jail calls over the next

18 months.

Until April 2016, the parties had anticipated the trial would be held in September

of that year. In April, defense counsel David Bustamante was occupied in an unrelated

homicide trial and, after that trial, would need ample time to review the State's evidence

in Bennett's case. However, four days after the unrelated trial concluded on April 21, the

State learned Bennett was now demanding an immediate trial. On May 13, the court set

trial for June 8, with a speedy trial expiration date of July 8. On May 31, the court

continued the trial to July 7, 2016.

On June 1, 2016, Bustamante conducted a pretrial interview with crime lab

forensic scientist, Anna Wilson. Deputy prosecutor Edward Owens and the State's in-

house investigator, Dan Dale, were also present. During the interview, Wilson told

Bustamante that she was just assigned a new request to test Moore's blood-soaked shirt.

Bustamante responded, "Oh, good." CP at 203. The shirt had been collected as evidence

in September 2014, but Wilson believed it was too blood soaked to likely yield any DNA

other than Moore's. She thought the massive amount of female DNA would likely mask

any male DNA. Due to the crime lab's resource limitations, it chose other items for testing that it considered more likely to identify the killer.

The new request to test the shirt came from Owens after he and Dale learned from Wilson in a late May interview that Bennett was an unusually "heavy shedder" of his DNA, meaning he left more DNA on items he touched than most persons would. CP at 281. Dale, a former trooper with the WSP, asked whether that would make it more likely Bennett's DNA could be recovered from Moore's blood-saturated shirt. Considering the high amount of Bennett's DNA present on the blood-stained pillow, Wilson concluded there was a greater chance the shirt would yield useful evidence than originally believed. She agreed to test the shirt.

In a June 6, 2016 pretrial hearing, Bustamante told the court he approved testing the shirt because he believed the results might exonerate Bennett, but he was otherwise concerned about the timing and ability of his defense DNA expert, Dr. Randell Libby, to review the results in advance of the July 7 trial. He did not, however, object to the late testing.

Wilson produced the DNA test results on June 29, 2016. DNA obtained from several areas on the front of the shirt showed a mixture consistent with three male individuals, with the partial major Y-STR profile matching Bennett. Neither he nor any

of his paternal male relatives could be excluded as the donor. In one area of the shirt, the

profile is not expected to occur more frequently than 1 in 9,400 male individuals in the

United States population. In other areas of the shirt, including around the puncture holes,

the profile is not expected to occur more frequently than 1 in 75 male individuals in the

United States population. Other potential suspects, including Wendy Swain's boyfriend

John Rehfield, Ricky Swain, and Guy Austin (Moore's former boyfriend) were excluded

as contributors of any DNA on the shirt. There was no male DNA detected on the neck

area of the shirt. The test procedure consumed the entire DNA sample, as agreed to in

advance by the defense.

Meanwhile, Detective Hufman had been listening to recordings of Bennett's jail

calls but he was nine months behind due to time constraints. In late April 2016, he started

listening to the recordings of Bennett's calls made between December 2, 2014, and

January 27, 2015. Sometime after June 6, 2016, he heard for the first time a late 2014

conversation in which Bennett cautioned his wife Trisha that they needed to keep their

stories straight. Hufman notified the prosecutor's office and, on June 15, delivered a

report and a copy of all of the recordings he had reviewed to that date. All the while—

since December 2014—Hufman did not want Bennett to know law enforcement was

reviewing his calls, so he unilaterally decided to withhold the recordings from the

prosecution. For this reason, Bustamante was not apprised of the recordings until the prosecutor gave him a compact disc (CD) containing over 200 hours' worth of calls on June 17, 2016.

On July 1, 2016, Bennett moved to dismiss the charge for governmental mismanagement under CrR 8.3(b), alleging the State had untimely tested the shirt it had in its possession since September 2014 and that it violated the omnibus order by deliberately withholding over 200 hours of recorded phone calls until June 2016. Bustamante explained the defense team would be unable to finish listening to all of the jail call recordings by the trial date, and the defense DNA expert would need four to five weeks to analyze the new test results—all of which would necessitate adjusting trial strategy accordingly. Bennett argued the State's mismanagement prejudiced his right to a fair trial by forcing him into a "Hobson's choice" between his speedy trial right and his right to effective assistance of counsel. CP at 150. As alternatives to dismissal, Bennett asked the court to suppress all evidence received after May 31, 2016, or continue the trial two months.

The State denied any mismanagement, but joined in the request for a two-month trial continuance to September 2016, as the parties had earlier contemplated before Bennett's immediate trial demand in late April. The court denied Bennett's motion to

dismiss or suppress evidence, but granted a two-month continuance. Additional facts

relating to the CrR 8.3(b) dismissal motion are discussed in the analysis.

The jury trial began in September 2016. The State's theory was that Bennett was

the last person known to see Moore alive on September 7, 2014, his DNA was present on

multiple items at the crime scene, he gave inconsistent statements to police about his

activities and whereabouts on the afternoon of September 7, and he became enraged at

Moore and killed her because she was about to evict him for nonpayment of rent. The

defense theory, as argued in closing, was that Bennett's DNA was on the items in

question because he was in Moore's house paying rent, not because he killed her.

Because he paid his rent, he had no reason to be angry with her or kill her. He argued the

killer could have been Moore's daughter or another of Moore's tenants who was

delinquent on rent. Those persons' DNA were not tested. Bennett did not testify. The

jury could not reach a unanimous verdict, and the court declared a mistrial.

Prior to the second trial, the State asked Bennett whether he intended to proffer

"other suspect" evidence, and, if so, to identify the other suspects.[1] In response, Bennett

identified Moore's daughter Wendy Swain and her boyfriend John Rehfield, tenants

---

[1] The State had not moved to limit "other suspect" evidence in the first trial.

Charles and Brandi Larr who struggled to pay rent, and any of Moore's other tenants who were delinquent on rent.

The State moved in limine to exclude the other suspect evidence on the grounds that Bennett had failed to proffer any nonspeculative evidence tending to create a reasonable doubt as to Bennett's guilt. The trial court granted the State's motion and excluded Bennett's other suspect evidence. Additional aspects related to the court's ruling are discussed in the analysis.

The second jury trial began in February 2017. The State's theory of the case, again, was that Bennett went into a rage and killed Moore on September 7 because he could not pay his overdue rent and she was about to evict him. The State posited that Bennett returned to Moore's house later on September 7 with his wife to clean up the murder scene.

The State's evidence detailed the discovery of Moore's body on September 8, the ensuing investigation and determination that Bennett was the last known person to be in Moore's house and see her alive. The evidence also included testimony of Detective Hufman relating Bennett's various accounts of his whereabouts and activities on the afternoon and evening of September 7, testimony of Dr. Kiesel about Moore's multiple injuries, and testimony of Anna Wilson confirming the DNA test results showing the

presence of DNA, consistent with Bennett's, on the pillow found on Moore's face, on her

blood-soaked shirt, on her kitchen cabinet, and on a cigarette butt found near Moore's

body. The State also introduced several jail call recordings between Bennett and his wife

Trisha that the State argued contained inculpatory statements. The Bennetts later testified

that the purported inculpatory statements were misconstrued by the State and related to

marital issues rather than the murder. These statements are discussed more fully in the

analysis.

Bennett's theory of the case, as presented through his evidence and cross-

examination of State's witnesses, was that he paid his rent to Moore on September 7, he

fully accounted for his whereabouts and activities that day, and he was not involved in her

murder. He also explained that the presence of his DNA on multiple items was due to

contamination at the murder scene or in the crime lab or was due to direct or secondary

transfer onto the tested items during his multiple interactions with Moore.

As evidence that Bennett was about to be evicted, the State introduced testimony

from Moore's neighbor, Joyce Andersen, that Moore declined a lunch invitation for

September 7 because "106 G" was supposed to come over at 12:30 p.m. to pay rent.

Report of Proceedings (RP) (Feb. 15, 2017) at 4313. Moore told Andersen, "[I]f he

doesn't pay me what he's supposed to pay me, I'm going to tell him if he can't afford it,

11

he can go find someplace he can afford." RP (Feb. 15, 2017) at 4314. The State also introduced testimony from Bennett's coworker at C & C Farms, Nicholas Cobb, that in early September 2014, Bennett asked for him for a $700 loan to pay his rent. Cobb did not loan him the money.

The State also presented evidence that officers and CSRT members took careful measures at the murder scene to not touch, disturb, or contaminate evidence or leave any DNA on items. This included wearing gloves and shoe covers and changing gloves when handling each different item. On cross-examination, Trevor Allen discussed the protocol used for taking, handling, and packing blood swabs so they do not become contaminated, as well as DNA collection training to avoid cross-contamination from coughing and sneezing. He explained that small aerosolized droplets can spread out a short distance. Hypothetically, if a person was standing near the kitchen cabinet and coughed in that direction, it could account for that person's DNA being present in a later-deposited bloodstain.

Forensic scientist Anna Wilson described the crime lab's procedures that control against contamination and ensure accuracy and reliability of test results. Procedures include wearing a lab coat, mask, and gloves. The lab bench area is cleaned and new gloves are worn between each item of evidence. Without changing gloves, DNA could

accidentally get transferred from one item to another. To preserve evidence, it is repackaged in its original package and placed in the evidence vault. Wilson discussed the concept of transfer DNA. For example, DNA could be transferred by shaking a person's hand and the second person touching a table untouched by the first person. Wilson said the crime lab scientists wear gloves to prevent DNA transfer/cross-contamination. In this case, Wilson said she saw no evidence of contamination either at the crime scene or in the laboratory.

Discussing hypotheticals posed by defense counsel on cross-examination, Wilson said the transfer concept by shaking hands could possibly account for Bennett's DNA being on the pillow that he said he never touched. Addressing the bloodstain on the kitchen cabinet, Wilson said it could not be determined when or how Bennett's DNA was deposited—just that it was there. She said it would be very easy for a person coughing or sneezing in that area to deposit their DNA on the object's surface. She said if Bennett's DNA was already present on the cabinet from a prior cough, but later someone else made a swipe with their hand without leaving detectable DNA, it would explain why Bennett's DNA was in the bloodstain. Similarly, the scenario could be explained if Bennett's DNA was deposited on the cabinet from coughing at an earlier time, and that third person swiped it with a gloved hand and, therefore, left no DNA on the blood pattern. In the

case of someone like Bennett, a heavy shedder, if he were to shake hands with someone like Moore, and then she casually brushed her hand against her shirt later, this could result in transferring Bennett's DNA onto her shirt. Wilson concluded with respect to Bennett's "what-if examples" that she cannot say how his DNA got on the items but could only say "is this possible or not." RP (Mar. 2, 2017) at 5833. Wilson also confirmed that DNA can be detected on an item even many years after it was deposited, depending on storage conditions.

Bennett testified on his own behalf. He said in July 2014, when he signed the lease at Moore's house, he had a tickle in his throat and went into her kitchen for a glass of water while coughing five or six times. He had mentioned this in an interview with Detective Hufman. He also said he never touched the pillow.

Bennett testified he was at Moore's house three times on September 7. He first arrived at around 12:30 p.m. and paid her $525 for rent. He petted her dog while he was there. He went home and returned a short time later to pay $400 that he had forgotten to bring for the remainder owed on his deposit. He paid everything in cash. He said Moore wrote him receipts from her carbon copy receipt book and placed the money in her bank bag. He returned to Moore's house a third time, at around 1:00 p.m., to retrieve his wallet, which he had inadvertently left behind. He said Moore met him at the front door

14

and handed him his wallet. He thanked her, and they shook hands. He never returned to her house or to her alleyway at any time that day. He denied any involvement in Moore's murder and insisted he would have no reason to kill her. He denied she told him he would have to find a new place to live. Trisha Bennett likewise testified that neither she nor her husband were ever in the alleyway near Moore's house on September 7. She denied involvement in cleaning up the murder scene.

Bennett also denied asking Nicholas Cobb for a $700 loan in September to pay his rent. He did concede he had not repaid $750 that he had borrowed from Mike Cobb for August move-in costs. Detective Hufman asked Bennett for the rent receipts, but he was never able to find them.

Moore's personal representative, Terry Kinzel, had earlier testified she inventoried Moore's belongings after her death, including her business records. She knew Moore as a meticulous record keeper. Ms. Kinzel said there was only $418.59 in the bank bag Moore used for rent payments. She also said she could not find Moore's rent receipt book for 2014, which was the only missing receipt book, and she did not find a September 2014 receipt for Bennett.

The jury acquitted Bennett of first degree murder, but found him guilty of second degree murder. The jury also found that the State had proved two aggravating

circumstances—deliberate cruelty and particularly vulnerable victim.  The court denied

motions by Bennett to vacate the aggravators for insufficient evidence and vagueness and

to be sentenced within the standard range of 134 to 234 months.  The court imposed a

660-month exceptional sentence.

Bennett timely appealed.

## ANALYSIS

Bennett argues the trial court erred by denying his CrR 8.3(b) motion to dismiss

for governmental mismanagement, by excluding "other suspect" evidence, and by

imposing an exceptional sentence.  He also argues prosecutorial misconduct during

closing argument deprived him of a fair trial.

A.    GOVERNMENTAL MISCONDUCT

Bennett argues the trial court abused its discretion in denying his motion to dismiss

the case for governmental mismanagement, or, in the alternative, to suppress evidence,

due to the State's withholding of the jail call recordings and belated DNA testing of

Moore's blood-soaked shirt.  He contends this mismanagement prejudiced his right to a

fair trial by forcing him to choose between his rights to a speedy trial and effective

counsel.

16

1. *The governing court rule*

CrR 8.3(b) provides:

The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

2. *Standard of review*

We review a court's ruling under CrR 8.3(b) for abuse of discretion. *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997). "A court abuses its discretion when an 'order is manifestly unreasonable or based on untenable grounds.'" *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 668, 260 P.3d 874 (2011)).

3. *Legal standards*

To obtain dismissal under CrR 8.3(b), the defendant must show by a preponderance of the evidence (1) arbitrary action or governmental misconduct and (2) actual prejudice affecting the defendant's right to a fair trial. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *Michielli*, 132 Wn.2d at 239-40). Dismissal of charges under CrR 8.3(b) is an extraordinary remedy saved for egregious

cases and is improper absent material prejudice to the rights of the accused. *State v.
Moen*, 150 Wn.2d 221, 226, 76 P.3d 721 (2003); *Rohrich*, 149 Wn.2d at 653.
Governmental misconduct can be something as basic as simple mismanagement. *State v.
Barry*, 184 Wn. App. 790, 797, 339 P.3d 200 (2014) (citing *Michielli*, 132 Wn.2d at 239).
Violations of the State's discovery obligations can support a finding of governmental
misconduct. *Id.* at 796-97; *Salgado-Mendoza*, 189 Wn.2d at 429.

Meeting the prejudice prong of CrR 8.3(b) "requires a showing of not merely
speculative prejudice but actual prejudice to the defendant's right to a fair trial." *Rohrich*,
149 Wn.2d at 649. Late disclosure of material facts can support a finding of actual
prejudice. *Salgado-Mendoza*, 189 Wn.2d at 432. "In the dismissal context, a defendant
is prejudiced when delayed disclosure interjects 'new facts' shortly before litigation,
forcing him to choose between his right to a speedy trial and to be represented by an
adequately prepared attorney." *Id.*; *Michielli*, 132 Wn.2d at 240; *Barry*, 184 Wn. App. at
796-97.

    *4.  Application of legal standards to facts*

 *Jail call recordings*

As stated above, Detective Hufman accumulated some 250 hours of recordings of
Bennett's jail calls, but due to resource limitations, he was nine months behind in

listening to them. It was not until sometime after June 6, 2016, when he first heard a late 2014 conversation in which Bennett cautioned his wife they needed to keep their stories straight. Hufman immediately notified the prosecutor's office. On June 15, he delivered a report and a copy of all of the recordings he had reviewed to date. Hufman admitted he had, until then, unilaterally decided to withhold the recordings because he did not want Bennett to know law enforcement was reviewing his calls. Defense counsel Bustamante was, thus, not apprised of the recordings until June 17, 2016, when the prosecutor turned over a CD containing a recording of all the jail calls.

In responding to Bennett's CrR 8.3(b) dismissal motion, the prosecutor stated that Bennett's late 2014 call with his wife about keeping their stories straight was the sole recording the State might use at trial and only in the event Bennett's wife testified. Bustamante maintained that the defense team would be unable to finish listening to 250+ hours of recordings by the trial date. He told the court it was necessary to listen to all of the calls for potential exculpatory evidence that could impact his trial strategy.

The prosecution has a continuing duty to disclose to the defense any written or recorded statements made by the defendant. CrR 4.7(a)(1)(ii), (h)(2). Contrary to what the State suggests, CrR 4.7(a)(1)(ii) does not condition the prosecutor's obligation on intent to use the statements at trial.

Here, as the trial court recognized, there was no governmental misconduct. Detective Hufman learned of the "stories straight" recording on June 6 and immediately notified the prosecutor's office. CP at 286. On June 15, he delivered a report and a copy of all of the recordings to the prosecutor's office. The prosecutor promptly disclosed the recordings to Bennett two days later and identified to the defense the "stories straight" recording that he intended to use for impeachment purposes. The government, thus, promptly disclosed the recording once it learned of it.

To the extent the delay attributable to Detective Hufman's time constraints can be considered mismanagement, it is not of a magnitude to warrant dismissal or suppression. Moreover, the fact the recordings and the contents of those conversations were within Bennett's own knowledge cannot be a surprise to him. If Bennett had exculpatory information, he knew the information and could have informed defense counsel without counsel reviewing all of the recordings. To the extent defense counsel actually believed all of the recordings needed to be reviewed, a two-month trial continuance was an appropriate remedy.

*Testing of the blood-soaked shirt*

As stated above, Moore's blood-soaked shirt was collected by investigators in September 2014, but forensic expert Wilson believed it was too saturated to likely yield

20

any DNA other than Moore's. And due to resource limitations, the crime lab limited initial testing to items most likely to identify the murderer. A deputy prosecutor later asked Wilson to test the shirt when she disclosed to him in late May 2016 that Bennett was an unusually heavy shedder of his DNA. Wilson agreed to test the shirt because Bennett had left what she considered to be a surprisingly high amount of DNA on the pillow, and she concluded there was a greater chance the shirt would yield useful evidence. Given the unanticipated accelerated proceedings, the State had not intended to test the shirt if trial had remained set for June 8, but instructed Wilson to do so on May 31, when, on that date, trial was continued to July 7.

When Wilson told Bustamante during the June 1 interview that the shirt would be tested, he approved. The State offered to allow a defense expert to observe the testing, provided it was not Bennett's disclosed DNA expert, Dr. Libby, who was barred from the testing areas in all WSP crime labs. The State gave Bustamante a list of private DNA experts, but he declined to use someone other than Dr. Libby.

At the June 6 pretrial hearing, Bustamante voiced concern to the court about his June 1 interview with Wilson. He criticized the State for not having tested the shirt sooner and said he would oppose any further requests for continuances while awaiting the results. He said the results should be excluded if they are not produced one week before

21

trial.  The prosecutor explained he had wanted the shirt tested earlier but the crime lab

declined because their policy is to test only so many pieces in a case.

Bustamante responded:

[A]gain, in principle, I am totally in favor of testing these items.  I believe
they may exonerate my client.  However, the timeliness is the only thing I
question.  And if the state crime lab says, no, we're not going to test it a
year and a half ago and then they suddenly decide to do it a . . . month
before the trial, then that's government mismanagement, even though it may
not be the prosecuting attorney's fault.

RP (June 6, 2016) at 25.

When the June 29 test results showed that Bennett's DNA was on the blood-

soaked shirt, Bennett moved for dismissal on grounds the belated testing was inexcusable

governmental mismanagement.  During the July 5 hearing, Bustamante argued that

Wilson knew since late 2014 that Bennett was a "heavy shedder" of DNA, yet the shirt

was not tested until June 2016.  He argued the crime lab's resource limitations are not a

valid excuse for delay.  For the first time, he contended the testing delay forced him to ask

for a continuance to analyze the DNA results and placed him in a Hobson's choice

between his rights to a speedy trial and effective assistance of counsel.  During the

hearing, Bustamante confirmed he had favored the testing just one month earlier at the

previous hearing.  Given the results, which Bustamante characterized as a "mixed bag"

and "potentially exculpatory" because only miniscule partial profiles of Bennett's DNA

22

were present, he said it would take Dr. Libby four to five weeks to conduct his testing.

RP (July 5, 2016) at 69. Thus, if not granted the remedy of dismissal or suppression,

Bustamante requested a two-month trial continuance. The court summarily declined to

dismiss the case or suppress evidence.

The court commented to the prosecutor:

But it sounds to me like you're agreeing with Mr. Bustamante, when he says that Mr. Bennett has been placed in a position where he has to choose between the effective assistance of counsel and a speedy trial. And that that delay is due to the state's failure to test this shirt a year and a half ago.

RP (July 5, 2016) at 81. The prosecutor partially agreed and explained he had fast-

tracked the testing in June, and defense counsel invited the test because he thought the

results would be exculpatory. The court ultimately granted a two-month trial

continuance.

Given Bennett's unanticipated refusal to continue the trial date past July 2016,

and given Bennett's tactical decisions surrounding the testing of the shirt, we agree with

the State that Bennett has no grounds to claim mismanagement. Even though the State

had the blood-soaked shirt since September 2014, Bustamante had favored testing in

June 2016 because he believed the results would be exculpatory. It is apparent that

Bennett rolled the dice, gambling that the test results would be exculpatory. Bennett's

failure to object to the late testing—indeed his agreement to it—renders the trial court's

23

decision to grant a two-month continuance very reasonable. We conclude the trial court did not abuse its discretion.

B.      OTHER SUSPECT EVIDENCE

Bennett argues the trial court violated his constitutional right to present a defense when it excluded his "other suspect" evidence. He argues he should have been allowed to present evidence and argue that (Moore's daughter) Wendy Swain, and (her boyfriend) John Rehfield committed the murder, or Moore's tenants Charles and Brandi Larr committed the murder, or any other tenant who had not paid Moore rent may have committed the murder. Bennett contends the trial court misapplied the law by requiring him to establish that these other suspects had taken a step indicating an intention to act on their various motives for committing the crime.

1.      *Standard of review*

We review claims of evidentiary error implicating constitutional rights for an abuse of discretion. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019); *State v. Blair*, 3 Wn. App. 2d 343, 351, 415 P.3d 1232 (2018). We then review claims the evidentiary ruling violated the defendant's constitutional right to present a defense de novo. *Arndt*, 194 Wn.2d at 797.

## 2.  *Legal principles for evidentiary ruling*

A trial court's exclusion of "other suspect" evidence is an application of the general evidentiary rule that excludes evidence if its probative value is outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury.  *State v. Franklin*, 180 Wn.2d 371, 378, 325 P.3d 159 (2014) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).  Before the trial court will admit "other suspect" evidence, the defendant must present a combination of facts or circumstances that points to a nonspeculative link between the other suspect and the crime.  *Franklin*, 180 Wn.2d at 381.  The standard for the relevance of such evidence is whether it tends to connect someone other than the defendant with the charged crime.  *Id.*

The inquiry "'focuse[s] upon whether the evidence offered tends to create a reasonable doubt as to the *defendant's* guilt, not whether it establishes the guilt of the *third party* beyond a reasonable doubt.'"  *Id.* (alteration in original) (quoting *Smithart v. State*, 988 P.2d 583, 588 & n.21 (Alaska 1999)).  Additionally, the probative value of "other suspect" evidence must be based on whether it has a logical connection to the crime, not based on the strength of the State's case.  *Id.* at 381-82.

The *Franklin* court discussed the rule in *Downs*[2]—that other suspect evidence is admissible only if the defendant can show "'a train of facts or circumstances as tend clearly to point out some one besides the [accused] as the guilty party.'" *Franklin*, 180 Wn.2d at 379 (quoting *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932)). The *Franklin* court affirmed the rule, but explained "'[m]ere evidence of motive in another party, or motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.'" *Id.* (alteration in original) (quoting *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933)). The *Franklin* court also noted, "'[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose.'" *Id.* at 380 (alteration in original) (quoting *Kwan*, 174 Wash. at 533).

*Franklin*, quoting *People v. Mendez*, 193 Cal. 39, 52, 223 P. 65 (1924), *overruled in part on other grounds by People v. McCaughan*, 49 Cal. 2d 409, 317 P.2d 974 (1957), explained that these rules rested on the necessity that trial of cases be both orderly and expeditious. *Id.* Without requiring a sufficient nexus between the other suspect and the crime, a defendant "'might easily . . . produce evidence tending to show hundreds of

---

[2] *State v. Downs*, 168 Wash. 664, 13 P.2d 1 (1932).

other persons had some motive or *animus* against the deceased . . . .'"  *Id.* (quoting

*Mendez*, 193 Cal. at 52).

"When the State's case is entirely circumstantial, the *Downs* rule is relaxed to an

extent to allow a reply in kind: the 'defendant may neutralize or overcome such evidence

by presenting sufficient evidence of the same character tending to identify some other

person as the perpetrator of the crime.'"  *State v. Hilton*, 164 Wn. App. 81, 99, 261 P.3d

683 (2011) (quoting *State v. Clark*, 78 Wn. App. 471, 479, 898 P.2d 854 (1995)).

> 3.     *Legal principles for the constitutional right to present a defense*

Both the Sixth Amendment to the United States Constitution and article I, section

22 of the Washington Constitution guarantee a criminal defendant the right to present a

defense.  *State v. Strizheus*, 163 Wn. App. 820, 829-30, 262 P.3d 100 (2011).  This right

includes the right to examine witnesses and to offer testimony.  *State v. Jones*, 168 Wn.2d

713, 720, 230 P.3d 576 (2010) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.

Ct. 1038, 35 L. Ed. 2d 297 (1973)).  These rights are not absolute.  "Evidence that a

defendant seeks to introduce must be of at least minimal relevance."  *Id.* (internal

quotation marks omitted).  A criminal defendant does not have a constitutional right to

present irrelevant or inadmissible evidence.  *Id.*; *State v. Hudlow*, 99 Wn.2d 1, 15, 659

P.2d 514 (1983).

"'[I]f relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" *Jones*, 168 Wn.2d at 720 (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). The integrity of the truth-finding process and a defendant's right to a fair trial are important considerations. *Hudlow*, 99 Wn.2d at 14.

### 4.    Bennett's "other suspect" evidence

Bennett points to Detective Hufman's speculation at the outset of the investigation that a close family member committed the crime because there were no signs of forced entry. Hufman thought it appeared to be a "rage" killing and staged burglary because valuables such as cash, credit cards, and a coin collection worth several thousand dollars were clearly accessible but not stolen. According to Bennett, Wendy Swain and John Rehfield had opportunity and ability to commit the crime because Swain lived within one mile of Moore, was welcome in her home, and could not verify her claim she was out "rock picking" on the day of the murder. RP (Feb. 6, 2017) at 3163. Bennett contended Swain had motive because she stood to receive a significant inheritance from her mother and also had had an argumentative relationship with her. According to Moore's sister-in-law, Camilla Hatch, Moore's children "were just waiting for her to die." CP at 64.

In addition, two days after the murder, Swain and Rehfield went to Moore's bank and asked how someone could gain access to a safe deposit box belonging to a person who had become deceased. Bennett theorized this was circumstantial evidence that Swain and Rehfield may not have found a particular item when they ransacked the house, so they went to the safe deposit box to look for it. The bank manager, Jeff Mackey, said Rehfield did most of the talking for the two of them. He described the interaction as "very '[c]old.'" CP at 64. Detective Hufman reported a similar experience when he gave Swain the keys to Moore's house after the crime scene was processed. He recommended they hire a cleaning service but Rehfield said they would do cleanup themselves. Hufman testified at his first trial that his contact with Swain and Rehfield was "very cold and unsettling." CP at 8. Rehfield was given a polygraph examination, and the examiner determined he "'was not being truthful during the testing.'" CP at 68. Bennett also proffered that some of Moore's other tenants, in particular Charles and Brandi Larr, may have committed the crime.

The State's theory was that Bennett killed Moore because he could not afford to pay rent and was about to be evicted, but Bennett pointed out that other tenants had been further in arrears. The Larrs had problems with timely rent payments. Wendy Swain told Detective Hufman early in the investigation that the Larrs could have had something to do

with the killing because they were about to be given an eviction notice. Their next door

neighbor, Daniel Keyser, testified at the first trial that a few days prior to the murder, he

heard Moore arguing with Brandi Larr in the Larrs' front yard. Keyser heard Moore

loudly say, "'Do I have to show you the lease?'" CP at 871. Brandi Larr testified at the

first trial and denied the argument ever took place. In his "other suspect" proffer, Bennett

contended the denial of the argument was suspicious and showed consciousness of guilt.

Another neighbor, Anastasia Bunakova, saw a man cross the street from the general

direction of the Larrs' residence and enter the back of Moore's house on the afternoon of

September 7. Bennett contended this supported the theory that Charles Larr was the

killer.

### 5.     *Hearing on State's motion to exclude*

At the hearing on the State's motion to exclude "other suspect" evidence, the court

first commented that Bennett's offer of proof showed "a strong argument here about

motive and opportunity." RP (Feb. 16, 2017) at 3154. The court then stated:

> The question is what evidence is it that links that motive and opportunity to
> potentially this crime?" And I think the case that I looked at, *State vs.
> Starbuck*, [189 Wn. App. 740, 752, 355 P.3d 1167 (2015)] says, "The
> proposed evidence must also show that the third party took a step indicating
> an intention to act on the motive or opportunity." And so that's what I'm
> searching for. What is the evidence that shows a step indicating an
> intention to act on the motive or opportunity? I think you've laid out

motive and opportunity, potentially, but what is it there that's going to show
me an intention to act on either the motive or opportunity?

RP (Feb. 6, 2017) at 3154-55.

Defense counsel Bustamante emphasized the principle recited in *Starbuck* that

when, as here, the State's case is entirely circumstantial, the train of facts or

circumstances rule in *Downs* is relaxed to allow the defendant to present evidence of the

same character tending to identify some other person as the perpetrator of the crime.

Bustamante argued other circumstantial evidence included the fact Moore's rental receipt

book was missing, thus inferring she could have been killed by any one of her tenants or

that Swain had taken it upon gaining access to Moore's house after her death and was

attempting to cast blame on a tenant.  He argued other suspects could also be inferred

because there were unidentified footprints at the scene and the DNA of two other

unknown males besides Bennett's was also present on the pillow and on Moore's shirt.

Bustamante conceded the evidence is circumstantial that someone besides Bennett was

there at the time of the killing, but argued the evidence should be considered and weighed

by a jury because the State's case also is circumstantial.

The State responded that there was no evidence beyond speculation that Swain,

Rehfield, or either of the Larrs were at Moore's house on the day of the murder or that

they had anything to do with the crime.  Anastasia Bunakova did not pick Rehfield or

31

Larr in a photomontage, but her daughter Vera Bunakova had picked Bennett as the

person she saw in the alley behind Moore's house. Bennett was the only one known to be

present in Moore's house on the day of the murder.

In granting the State's motion, the court reasoned:

[B]asically I'm just relying on the *Starbuck* case and the ones that it cites to, and in particular the line that I quoted, which was, "The proposed evidence must also show that the third party took a step indicating an intention to act on the motive or opportunity."
    *As far as I can tell, I've not heard anything that identifies evidence that would show some type of step taken by any of these other individuals that the defendant has identified as potentially having committed the crime.*
    I'll also note that there's a case called *State v. Franklin*, this is 180 Wn.2d 371, they cite to a California case, for an interesting quote, this is from [*People v. Mendez*, 193 Cal. at 52], and it says, "It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life, it might easily be possible for the defendants to produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased."
    And I think that's kind of instructive as to what we have here, which is we have somebody obviously who is deceased, and there might be other people who might have had a motive. And certainly, you know, the motive can be identified. *But without something that shows some affirmative step towards actually doing the crime, it comes down to basically it not being relevant enough to outweigh the burden or outweigh the—what's the rule say, [ER] 403?—outweigh the danger of potential confusion of the issues or misleading the jury or potentially unfair prejudice.*

RP (Feb. 6, 2017) at 3170-71 (emphasis added).

32

>   *6.      Application of facts to legal principles*

The trial court relied on language in *Starbuck* that requires Bennett to show that

the other suspect "took a step indicating an intention to act on the motive" to commit the

crime.  189 Wn. App. at 752.  Support for this requirement can be traced back to language

in *Downs* that "a train of facts or circumstances as tend clearly to point out someone

besides the accused as the guilty party."[3]  *Downs*, 168 Wash. at 667.  We need not

determine whether the "took a step indicating an intention to act" requirement in

*Starbuck*, *Rafay*, and *Rehak* is consistent with *Downs*.  Rather, we can affirm the trial

court simply by applying the legal principles outlined above in part B2, principles that

Bennett does not contest.

The State's evidence against Bennett was both circumstantial *and* direct.  The

State's circumstantial evidence included DNA consistent with Bennett's on Moore's

blood-soaked shirt, the pillow on her head, a cigarette butt near Moore's body, and a

blood smear on a kitchen cabinet.  In addition, Bennett was the last person known to have

seen Moore alive.

---

[3] *Starbuck* cites *State v. Rafay*, 168 Wn. App. 734, 800, 285 P.3d 83 (2012), which cites *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992), which cites and quotes this language in *Downs*.

33

The State's direct evidence consisted of a recorded jail call between Bennett and his wife, in which Bennett used his cellmate's callout identification code. The most inculpatory statement Bennett made was:

> Trisha, I'm not going to drag you down in this. I'm going to say this on the phone so it's set in stone. Okay? You know that I did it, and you were there with me.

CP at 1307. Although Bennett and his wife testified they were not talking about the murder, they were talking about the criminal case both before and after the quoted statement. Shortly after the statement, Bennett told his wife:

> We hold each other hostage . . . . Because right now, you can hang me by my neck. And I'm being serious. Because this account is going to be canceled tomorrow because my celly gets out tomorrow. . . . So all this shit will be gone by tomorrow. You can hang me out to dry in a matter of seconds. . . . But I can hang you out to dry in a matter of seconds. We hold each other hostage. We're at a Mexican standoff. . . .

CP at 1308. If the jury believed that Bennett's statements were a confession, a belief consistent with the context of the statements, the confession was direct evidence that Bennett was guilty of murder.

At the hearing to strike "other suspect" evidence, Bennett failed to present a combination of facts or circumstances that points to a nonspeculative link between his proffered other suspects and the crime. Although Bennett established his other suspects had motive and opportunity—that is all he established.

34

First, Bennett failed to link Swain and Rehfield to the crime with a train of facts or circumstances. For instance, there was no evidence that either Swain or Rehfield was seen near Moore's house after Moore attended Sunday church, or that either had ever threatened to kill Moore, or either person's DNA was found at the murder scene. In fact, Rehfield's DNA was excluded as being present on Moore's shirt. The only nonmotive evidence Bennett points to is Rehfield's question to a bank officer *after* the murder, about how Swain might access her mother's safe deposit box if she did not have the key. Such a question is not uncommon or suspicious.

Bennett also failed to link Mr. Larr or other tenants to the crime with a train of facts or circumstances. It is true that a man was seen walking into Moore's house the afternoon of her murder, but the only man identified as being near Moore's house the afternoon of her murder was Bennett. It also is true that DNA of three men was found on the pillow and Moore's bloody shirt, but the only DNA identified was DNA consistent with Bennett's. It also is true that other tenants were behind in rent, but the only tenant known to have seen Moore the day she was murdered was Bennett. He was the last known person to have seen her alive, and DNA consistent with his was found on multiple crime scene items. In sum, any tenant could have killed Moore, but only Bennett was linked to the murder with a train of facts or circumstances.

35

>Mere evidence of motive in another party, or motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.

*Kwan*, 174 Wash. at 533.

We conclude the trial court did not abuse its discretion by excluding Bennett's proffered "other suspect" evidence. The evidence was so speculative and clearly inadmissible under applicable evidentiary standards that its admission would have disrupted the fairness of the fact-finding process. For this reason, Bennett had no constitutional right to present it. *Jones*, 168 Wn.2d at 720.

C.     PROSECUTORIAL MISCONDUCT

Bennett contends the prosecutor committed prejudicial misconduct on six separate occasions during closing argument and rebuttal. The alleged instances of misconduct are discussed individually below.

*Legal principles*

To prevail on a claim of prosecutorial misconduct, the defendant must establish "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). Only when the conduct is improper does the

36

reviewing court determine whether the conduct resulted in prejudice. *State v. Emery*, 174

Wn.2d 741, 760, 278 P.3d 653 (2012). The State has wide latitude in drawing and

expressing reasonable inferences from the evidence, including inferences about

credibility. *State v. Thompson*, 169 Wn. App. 436, 496, 290 P.3d 996 (2012).

Misconduct is prejudicial if there is a substantial likelihood it affected the verdict.

*Emery*, 174 Wn.2d at 760-61.

However, a defendant who fails to object to the State's improper act at trial waives

any error unless the act was so flagrant and ill intentioned that an instruction could not

have cured the resulting prejudice. *Id.*; *Thorgerson*, 172 Wn.2d at 443. In making that

determination, the courts "focus less on whether the prosecutor's misconduct was flagrant

or ill intentioned and more on whether the resulting prejudice could have been cured."

*Emery*, 174 Wn.2d at 762.

*Arguing facts not in evidence re: Bodziak testimony*

This issue arises from Bennett's request for an order in limine to preclude the

State's shoeprint expert, William Bodziak, from testifying to any facts or conclusions not

specifically stated in his report. Bennett focuses on the following portion of Bodziak's

report in reference to a single bloody shoeprint at the crime scene:

In addition, present throughout this entire area are wipe marks in multiple directions. The wiping action has physically smeared the blood in some of those areas, including portions of the herringbone pattern. The characteristics evident [in] these images as well as images taken before enhancement *are typical of attempts to clean-up bloody footwear evidence.*

CP at 1373 (emphasis added).

Bennett argued that saying evidence is "typical of attempts to clean-up footwear evidence" is quite different from rendering an opinion that someone actually tried to clean up the scene. He argued Bodziak did not opine that the wipe marks were evidence that someone cleaned up bloody footwear prints in this case and it would be unfair to require the defense to respond to such an opinion without advance notice. The court commented that it expected Bodziak will say exactly what he wrote because that is all he opined. The parties agreed. The court later reiterated its ruling:

So with regard to Bodziak, when he's asked the question to the effect, did you see any evidence of attempts to clean, his answer needs to be in line with what he states, which is what I saw in the images taken before enhancement are typical of attempts to clean up bloody footwear evidence.

RP (Mar. 3, 2017) at 6037. The prosecutor concurred. The court confirmed these limitations with Mr. Bodziak and asked whether he would be able to stick with his opinion as stated in the report. Bodziak clarified that it was his opinion that the footprint was cleaned up. Bennett argued it would be unfair to allow him to deviate from his report

38

and, if allowed, the defense would need a recess to hire an expert and move for a *Frye*[4]

hearing.

> The court again reiterated its ruling:
>
> And so there is a slight distinction there. Certainly, [the prosecutor] can argue this in closing and say, based on that it appears to have evidence of a typical attempt to clean up bloody footwear, that's certainly an argument you can make before the jury. But to have the expert come up and actually express that opinion that in this case there was, in fact, in his opinion, an attempt to clean up this particular scene, there is a slight difference there.

RP (Mar. 6, 2017) at 6069. The prosecutor responded:

> Judge, I know we've got—but can I ask the court, what do you make of the sentence before that where he says, "In addition, present throughout this entire area"—and he's referring to this shoe print—"are wipe marks in multiple directions. The wiping action has physically smeared the blood in some of those areas, including portions of the herringbone pattern."
> That clearly says that he sees some wiping action through that herringbone. I mean I don't know how else you could draw the conclusion that—

RP (Mar. 6, 2017) at 6069-70. The court clarified:

> [H]e can state that entire paragraph. That is his opinion that he put in this. It's the step further that I ruled on Friday that he's prohibited from stating, which is that officially in this scene, there was an attempt to clean up. But he can certainly state that whole paragraph, if that's what he wants to state. And then you can argue in closing that his opinion, based on what he says, is, in fact, what you just argued.

RP (Mar. 6, 2017) at 6070.

---

[4] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

Bodziak testified about the wipe marks visible in photographs of the shoeprint.

In reference to slide number 8, he said:

> You see on the left from maybe running at 10:00 to 4:00 direction, from left
> to right, are a series of streaks. . . . And on the right, right underneath the
> orange—the B on the orange paper are again some other streaks. And at the
> bottom part of those there are actually streaks running down in a different
> direction. . . . So at least three different angles of wiping or wipe marks or
> streaks in these areas. And in the center are some remnants of a
> herringbone design impression.

RP (Mar. 6, 2017) at 6104. Addressing slide number 9, Bodziak said:

> In addition, present throughout this entire area are wipe marks in multiple
> directions. So these were the streaks, this direction, this direction. And
> then over here outside of this close-up over in this direction. So at least
> three very obvious areas where there's some wipe marks. . . . The wiping
> action has physically smeared the blood in some of those areas, including
> portions of the herringbone pattern.

RP (Mar. 6, 2017) at 6108. Bodziak continued:

> So this is just showing that the wipe marks are not just in different
> directions, but there's actually some additional ones in there that are curved.
> Then the end of the paragraph of my report says, "The characteristics
> evident in these images, as well as images taken before enhancement, are
> typical of attempts to clean-up bloody footwear evidence."

RP (Mar. 6, 2017) at 6110.

The prosecutor then asked Bodziak to confirm whether he found evidence of what

he thought was characteristics of a wipe mark in a curved nature. Bodziak responded,

"Yes. If someone's wiping, it's not always straight. . . . There's both evidence of

40

curvature, curving streaks and straight streaks in multiple areas." RP (Mar. 6, 2017) at

6111.

In closing argument, the prosecutor referred to Bodziak's testimony regarding the

shoeprint. He stated Bodziak's "observation was that there was clear evidence of clean-

up to the impression B, the blood." RP (Mar. 21, 2017) at 8202. The prosecutor

contemporaneously showed a PowerPoint purporting to summarize Bodziak's testimony,

including one slide stating in bold: "**Clear evidence of clean up to Impression B**

**(Blood)**." Ex. 528, slide 32.

Bennett objected and moved for a mistrial on grounds the argument stated facts not

in evidence. The court overruled the objection and directed the jury to consider only the

evidence it believes was presented. The prosecutor continued:

> And in those photographs, you heard him testify about the clear
> swipe marks around and through the impressions. The swipe marks are
> multi-directional, as well. *His testimony is this is a typical characteristic of*
> *clean-up. . . .* And the testimony he's talking about looking at the purple
> there, you can see the swipe marks through here and the swipe marks
> coming along there that he was talking about, and the swipe marks up there.

RP (Mar. 21, 2017) at 8203 (emphasis added).

During a recess, Bennett renewed his objection and motion for mistrial. The

prosecutor responded that following the court's admonition to the jury regarding the

"clear evidence of clean-up" statement, he "left it be. And . . . didn't go back to there."

41

RP (Mar. 21, 2017) at 8224. After commenting that Bodziak's testimony had included

the phrase "[a]ttempt to clean-up," the court said it considered the prosecutor's use of the

phrase "clear evidence of clean-up" to be argument. The court concluded: "I don't see

that as an issue." RP (Mar. 21, 2017) at 8225.

In rebuttal closing, the prosecutor again referred to the shoeprint, without objection

from Bennett:

> Bill Bodziak talked about . . . a conscious attempt to clean that area up. Do
> you remember the illustration he showed you, showing the wipes through
> the foot impression?

RP (Mar. 23, 2017) at 8588-89. The prosecutor showed another PowerPoint slide stating

there was "Evidence of Clean up per Bodziak." Ex. 528, slide 81. Again, there was no

objection.

The court instructed the jury, both orally at the end of closing and in its written

instructions, that the lawyers' statements are not evidence. The evidence is the testimony

and exhibits and that the jury must disregard any remark, statement, or argument that was

not supported by the evidence or the law in the instructions provided.

A prosecutor commits reversible misconduct by urging the jury to consider

evidence outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158

(2012); *State v. Jones*, 144 Wn. App. 284, 293, 183 P.3d 307 (2008) (prosecutors are not

permitted to make prejudicial statements unsupported by the record).  It is the court's role

to sustain proper objections to prosecutorial misconduct, and the court's failure to do so

sends a message to the jury that the State's argument is legitimate.  *State v. Allen*, 182

Wn.2d 364, 378, 341 P.3d 268 (2015).

The State's initial "clear evidence of clean-up" argument, without clarification, did

not reflect Bodziak's testimony or comport with the trial court's ruling in limine.  But in

continuing his argument immediately after Bennett's objection and the court's admonition

to the jury, the prosecutor walked back any error by clarifying that Bodziak had testified

that the clear evidence of swipe marks was a typical characteristic of cleanup.

Unfortunately, the prosecutor's later argument—that Mr. Bodziak testified about a

conscious attempt to cleanup—again misstated the evidence.

But these misstatements were not prejudicial because they did not have a

substantial likelihood of affecting the jury's verdict.  Whether someone tried to clean up a

bloody shoeprint was not critical to Bennett's conviction.  His conviction was based on

circumstantial evidence that he could not pay rent, his DNA being found on Moore's

blood-soaked shirt, the pillow on her head, a cigarette butt next to her body, and on a

blood smear on the cabinet.  His conviction was also based on direct evidence of his

confession—the jail call where Bennett used his cellmate's callout code.

To the extent the prosecutor's comments about Bodziak's testimony were improper, we conclude they were not prejudicial.

*Arguing facts not in evidence: Vera Bunakova saw Bennett in the alley*

This issue stems from Vera Bunakova's trial testimony that late in the afternoon on the day of the murder, she was picking cucumbers along her alleyway fence adjacent to Moore's property when she saw a "gentleman right around here walking and he was on a cell phone approaching me." RP (Mar. 1, 2017) at 5575. Bunakova said the man saw her and turned and walked away, but not before they looked directly at one another for two or three seconds. She saw the same man walking with a female a short while later. Again, the man turned away from Bunakova. She described him as taller than 5'10", not overweight, very young, and wearing a dark baseball cap, dark T-shirt, and dark wash, wide-legged jeans. Bunakova further testified she had identified the man that she saw in the alley in a photomontage shown to her at the prosecutor's office about one year after the murder. At trial, she answered "correct" when asked whether her initials next to a particular photograph in a montage exhibit indicated the person she believed she saw behind Moore's house. RP (Mar. 1, 2017) at 5597. The prosecutor then asked Bunakova: "From your observation today, is that person in the courtroom today?" Bunakova answered, "Yes." RP (Mar. 1, 2017) at 5598. Bunakova then turned and identified

Bennett as both the man she believed she had seen in the alley and had picked in the photomontage one year earlier.

The defense investigator Ellyn Berg testified she was the one who presented the photomontage to Vera Bunakova at the prosecutor's office. On defense cross-examination, Berg said that when Bunakova picked out Bennett she said she was a little more than 50 percent sure it was him in the alley. According to Berg, Bunakova seemed a lot more certain in her current trial testimony than she was when shown the photomontage in September 2015.

In closing, the prosecutor argued Vera Bunakova "saw the defendant, Chad Bennett, from approximately 15 feet away in the alley on his cell phone. She testified he looked right at Vera and made eye contact." RP (Mar. 21, 2017) at 8207. Bennett objected on grounds the prosecutor misstated the testimony and argued facts not in evidence. He moved for a mistrial or at least a curative instruction. The court overruled the objection, stating, "So I will tell you the jury one more time, you are the sole determiners or the individuals who will identify what, in fact, the facts were as presented. And ultimately this is just argument by the attorneys." RP (Mar. 21, 2017) at 8207.

The State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility. *Thompson*, 169 Wn. App. at 496.

45

Identification does not require knowledge of identity, as Bennett suggests. Vera

Bunakova told the jury the man sitting at counsel table was the man she identified in the

photomontage—the same man she saw twice in the alley and who made eye contact with

her. It was accurate for the prosecutor to argue that Bunakova saw Bennett in the alley.

Her testimony was a matter of weight and credibility for the jury to determine.

Bennett's citation to *Allen* is inapposite. There, the court committed prejudicial

error in twice overruling defense objections to the prosecutor's misstatement of the legal

definition of "knowledge" in closing argument. *Allen*, 182 Wn.2d at 378. There is no

such error here.

*Prosecutor's emotional appeals during rebuttal closing*

This issue arises from the following statements in the prosecutor's rebuttal closing

argument:

> I also need to say—and I forgot to—because we get up here and
> you've got a six-week trial, and you forget about things. But I needed to
> say to you that preliminarily, and I should have done that, to acknowledge
> Judge Estudillo for handling this case, six, seven weeks we've been
> together, some of you may have become friends, great friends in this
> process, but Judge Estudillo handling this case, did an exceptional job.
> Tom Bartunek, our court reporter, he and Claudia Mills keeping track of
> everything that's being said, which is a monumental task and keeping track,
> and keeping the lawyers straight with the exhibits that Claudia goes through
> is a big job, and the state wanted to acknowledge them. Along with Garey
> Clements, your bailiff, who is taking you in and out of court. And all the

jail staff and the people that are here listening to this case with great
interest.

RP (Mar. 23, 2017) at 8529-30. Bennett did not object.

Bennett's failure to object to the prosecutor's statements is a waiver of any error

unless the act was so flagrant and ill intentioned that an instruction could not have cured

the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. The prosecutor's statements

exhibiting courtesy are, at most, a de minimis attempt to ingratiate himself with the jury.

Bennett shows no apparent prejudice and certainly none that could not have been cured by

an instruction.

The same is true even if Bennett had objected. In *State v. Scherf*, 192 Wn.2d 350,

394, 429 P.3d 776 (2018), the prosecutor took advantage of his courtroom seating

position to smile and thank individual jurors during voir dire. The defense twice

objected, and the court admonished the prosecutor. The Washington Supreme Court

rejected Scherf's allegation of prosecutorial misconduct. The court held that Scherf did

not show that the prosecutor's contact with the jurors raised the risk of influencing the

verdict, any such conduct was de minimis, and it did not deny Scherf a fair trial. *Id.* at

395-96. Bennett likewise shows no measurable prejudice.

Bennett's cited case, *State v. Walker*, 182 Wn.2d 463, 341 P.3d 976 (2015), is not

helpful. There, the prosecutor committed flagrant, pervasive, and incurable misconduct

by using a PowerPoint presentation to confuse and mislead the jury, much like the State

had done in *In re Personal Restraint of Glassman*, 175 Wn.2d 696, 286 P.3d 673 (2012).

*Walker*, 182 Wn.2d at 479. The prosecutor did not confuse or mislead the jury here.

*Prosecutor's "we know" arguments*

This issue arises from the prosecutor's use of the phrase "we know" in closing and

rebuttal closing argument. First, in closing argument, the prosecutor discussed the earlier

quoted jail call between Bennett and his wife. The prosecutor displayed a PowerPoint

slide that said, "What we do know is they are discussing this case during this call."

Ex. 528, slide 79. Narrating the slide, the prosecutor argued:

> What we do know is they are discussing this case during this call. Chad
> states, "You know that I did it, and you were there with me." This is the
> information they were discussing when they were talking about holding
> each other hostage multiple times.

RP (Mar. 22, 2017) at 8314-15. Bennett did not object.

The next day, in rebuttal closing, the prosecutor was discussing the evidence of

Bennett's DNA on items from the crime scene. The prosecutor stated:

> The crime scene lab people, they went through that, they tested
> everybody they thought was in the house. That doesn't mean anybody else
> participated. But we know that Chad Bennett was there. We know that he
> grabbed the center of that pillow. And the only reasonable—

48

RP (Mar. 23, 2017) at 8531. Defense counsel objected to "that form of argument, what

we know" as being the prosecutor's opinion. RP (Mar. 23, 2017) at 8531. The following

exchange ensued:

> MR. DANO: I apologize, Counsel. I know counsel did that a few
> times himself, so—
> MR. BUSTAMANTE: It's easy enough.
> MR. DANO: It's an occupational hazard. Sorry, folks.
> The state's position, I'll say that, I've got to keep saying that, the
> state's position is that it's only—the only plausible explanation for that is
> that Chad Bennett grabbed that pillow after he killed Lucille Moore, and
> that's why his DNA is there.

RP (Mar. 23, 2017) at 8532. The court did not weigh in on the matter and the prosecutor

resumed his argument.

By failing to object, Bennett has waived the first instance of alleged misconduct

for using "we know" along with the PowerPoint slide. The comment was not so flagrant

and ill intentioned that an instruction could not have cured any resulting prejudice.

*Emery*, 174 Wn.2d at 760-61. The statement is within the wide latitude afforded the State

to argue—contrary to the Bennetts' testimonies—that they were, in fact, talking about the

murder.

With regard to the second instance, Bennett must show there is a substantial

likelihood it affected the verdict. *Id.* He does not meet that burden. The prosecutor's

explanation to the jury that his argument was the State's position, based on the evidence,

essentially served as a curative instruction that required no further discussion or input

from the court. As this court recently explained in *State v. Rodriguez-Perez*, 1 Wn. App.

2d 448, 460, 406 P.3d 658 (2017):

> There is a difference between the prosecutor's personal opinion, as an
> independent fact, and an opinion based on or deduced from the evidence.
> *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006) (quoting *State v.
> Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905)). Misconduct occurs only
> when it is clear and unmistakable that the prosecutor is not arguing an
> inference from the evidence but is expressing a personal opinion. *Id.* at 54
> (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59
> (1983)).

Unlike in Bennett's cited case of *State v. Stith*, 71 Wn. App. 14, 21-22, 856 P.2d 415

(1993), the prosecutor was not expressing his personal opinion here.

*Burden shifting*

Bennett argues the prosecutor shifted the burden of proof by stating that if there

was any favorable evidence, the defense would have presented it. This issue arises from

the following argument by the prosecutor in rebuttal closing, concerning initial steps by

law enforcement to lock down the crime scene:

> What did they do? They began processing the scene. They were
> meticulous about changing gloves. Counsel made a substantial—spent a lot
> of time with you talking about DNA and cross-contamination and so forth.
> *The state's position is if there was any evidence that there was actual
> contamination of this crime scene, the defense would have been talking
> about it.* They talk about a lot of possibilities, possibly this, possibly that,
> possibly this. *But there was nothing pointed out that there was any*

> *contamination introduced into this crime scene* where Chad Bennett's DNA
> was planted on the cigarette butt, on the pillow area—the pillow area.  I
> know you recall that Anna Wilson talked about that.

RP (Mar. 23, 2017) at 8526-27 (emphasis added).  Bennett did not object.  The prosecutor

then summarized the State's evidence of Bennett's DNA on each item and explained why

Bennett's speculative hypotheses were unlikely.

A defendant has no duty to present evidence; the State bears the burden of proving

each element beyond a reasonable doubt.  *State v. Fleming*, 83 Wn. App. 209, 215, 921

P.2d 1076 (1996).  It is misconduct for the prosecutor to argue otherwise.  *Id.*

Again, by failing to object, Bennett has waived the issue unless the comments were

so flagrant and ill intentioned that an instruction could not have cured any resulting

prejudice.  *Emery*, 174 Wn.2d at 760-61.  Allegedly improper arguments should be

viewed in the context of the total argument, the issues in the case, and evidence addressed

in the argument.  *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994); *see also*

*Thorgerson*, 172 Wn.2d at 442.  Here, when viewed in context, the prosecutor's

comments were an appropriate response to the defense closing argument.

Bennett's counsel made extensive closing argument about various

contamination/secondary transfer hypotheses to explain exculpatory reasons for the

presence of Bennett's DNA at the crime scene.  He theorized the killer may have been

wearing gloves because no male DNA was found on the victim's neck; thus, it is unknown how Bennett's DNA could have been deposited on the kitchen cabinet. He asked how DNA from two unidentified males could have gotten on Moore's shirt when she was not known to be a handshaker or hugger. He emphasized that the highly trained CSRT professionals were constantly changing gloves to avoid inadvertent transfer of DNA. He cited to Trevor Allen's and Anna Wilson's testimony giving hypothetical examples of ways DNA evidence can easily be contaminated or deposited, both through direct contact and secondary transfer, which can occur before investigators arrived, while they were processing the crime scene, or even at the crime laboratory. He argued various hypothetical theories of how Bennett's DNA could have come into contact with or been transferred onto the blood smear on kitchen cabinet, pillow, and Moore's shirt. He reminded the jury that forensic expert Wilson had admitted such transfer was "easy" without the necessary precautions. RP (Mar. 23, 2017) at 8458. Counsel concluded his closing argument recounting a hypothetical he had given Wilson, arguing Wilson's testimony allowed the jury to consider "if [Bennett] was a heavy shedder and his hand was very sweaty on a hot summer day when he shook hands with Lucille Moore, that might have been enough." RP (Mar. 23, 2017) at 8468.

The prosecutor's rebuttal argument did not suggest Bennett had any duty to present evidence of actual contamination, but was a proper direct response to Bennett inviting the jury to speculate about nonexistent contamination evidence in the State's case. *Russell*, 125 Wn.2d at 86 (pertinent remarks of prosecutor not grounds for reversal when invited by defense counsel). The prosecutor merely pointed out there was no such evidence. This is entirely consistent with the trial testimony—particularly Wilson's testimony that she saw no evidence of DNA contamination in this case either at the crime scene or in the crime lab. In this situation, it was not improper for the prosecutor to argue that in light of Bennett's various contamination hypotheses, he would have demonstrated actual contamination had there been any.

Bennett's cited case *Fleming* is distinguishable. There, the prosecutor argued lack of reasonable doubt because there was no evidence the victim had fabricated the charge or was confused, and, if there had been such evidence, the defendants would have presented it. 83 Wn. App. at 214. The court held the comments were improper burden shifting and also infringed on the defendants' election of the right to remain silent when viewed in conjunction with the prosecutor's additional remark that if the defendants are suggesting reasonable doubt, they would explain some fundamental evidence in the case.

*Id*. at 214-15. Here, on the other hand, the prosecutor did not shift the burden when directly responding to Bennett's hypotheticals.

### *Undermining the presumption of innocence and trivializing the jury's role*

This issue arises from the following argument by the prosecutor in rebuttal closing:

> I did want to say one other thing, as well, that I forgot to say at the outset. And that is that the system that we're involved in, of a jury trial, you hear the words due process. And this is an example. This is probably the biggest example of due process that this office—or that the state has participated in, where we've afforded the defendant every opportunity to— the state put on its case, and for the defense to have an opportunity to put on their response, and to speak to you.
>
> So there's been no rush to judgment in this. This has been ongoing for, as we know, since September of 2014. The investigation done by Detective Hufman and his crew, thousands of man hours have been devoted to this case. So this wasn't just a situation where a snap judgment was made, a decision to arrest the wrong man, to frame the wrong man was made. Nothing of that.

RP (Mar. 23, 2017) at 8536. Bennett did not object.

Once again, by failing to object, Bennett has waived the issue unless the comments were so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice. *Emery*, 174 Wn.2d at 760-61. And again, the prosecutor's comments must be viewed in context; they were in response to the defense closing argument. *Russell*, 125 Wn.2d at 86.

Bennett's counsel began his closing argument in the six-week trial by stating that

"90 percent of the state's case is based on one of four things . . . ." RP (Mar. 22, 2017) at

8329. The first thing was "statements that defendant has given at various times to

Detective Hufman that contain relatively minor discrepancies as to exact sequence of

events, exact[ly] what he did that day, where he went first, second and third, what times

he did what." RP (Mar. 22, 2017) at 8329. The second thing was the "state's basing its

case on [jail telephone] statements of the defendant taken after he was arrested, which the

state is now twisting, taking out of context and completely trying to make them appear

that the defendant is guilty, contrary to his testimony, contrary to his own explanations

why he said what he said, and contrary in some instances to common sense." RP

(Mar. 22, 2017) at 8329. The third thing was "statements and testimony from unreliable

witnesses who changed their stories from what they originally told the police at the time

the investigation first started. Or who completely made up things. Completely fabricated

details to suit what they found out later." RP (Mar. 22, 2017) at 8330-31. "And finally,

the state's case is based on speculation, supposition, outlandish theorizing and jumping to

conclusions and inviting you, ladies and gentlemen, to go along for the ride." RP

(Mar. 22, 2017) at 8331.

As the State contends, it was defense counsel's latter statement that invited the alleged inappropriate rebuttal comments. A comparison to the facts in *Stith* illustrates that the prosecutor's comments—to the extent any portion was arguably inappropriate—were not of a magnitude that any prejudice could not be cured with an instruction.

In *Stith*, a drug delivery case where the defendant had previously been convicted of that crime, the prosecutor commented in closing argument that defendant "'was just coming back and he was dealing again.'" *Stith*, 71 Wn. App. at 16. The prosecutor went on to remark in rebuttal:

> "And this case, ladies and gentlemen, wouldn't be . . . in court here today if there was any problem about the way Officer[s] Grady and Rossen acted. Our system has incredible safeguards that would not allow a case like this to come to court if somehow the police acted improperly. So the question of probable cause is something the judge has already determined before the case came before you today."

*Id*. at 17 (second alteration in original). The defense objected to both comments and the court gave curative instructions.

In finding that both comments were flagrantly improper, the court reasoned:

> The first comment indicated to the jury that the prior crime for which appellant was convicted was drug related (a fact which had not previously been entered into evidence) and is also impermissible opinion "testimony" that the appellant was selling drugs again and thus was guilty, not only of the previous charge, but also of the current charge. Moreover, the remark was made in spite of a direct court order on a motion in limine to exclude any evidence of prior drug convictions.

56

The second comment concerning "incredible safeguards" and the court's prior determination of probable cause not only constituted "testimony" as to facts not in evidence but also indicated to the jury that, if there were any question of the defendant's guilt, the defendant would not even be in court. This was tantamount to arguing that guilt had already been determined. Clearly, both comments were flagrantly improper.

*Id.* at 22. The court applauded the trial court's efforts to cure the violations, but held the misconduct was so egregious as to be incurable. *Id.* at 22-23. The court concluded:

[T]hese comments clearly reflect the prosecutor's personal assurances to the jury as to the defendant's guilt. Taken together these comments not only implied that the trial was a useless formality because the real issues had already been determined but also directly stated that Stith was out on the streets, dealing again. Such comments strike at the very heart of a defendant's right to a fair trial before an impartial jury.

*Id.* at 23.

Bennett contends the same is true here. He equates the prosecutor's phrase "the biggest example of due process"[5] the State has ever seen with the "our system has incredible safeguards" comment in *Stith.* And like the comments in *Stith* that the police did not act improperly and probable cause had already been determined, the prosecutor here told the jury the police had worked "thousands of man hours" and did not "arrest the wrong man." RP (Mar. 23, 2017) at 8536. Additionally, Bennett contends, the prosecutor here perversely used the length of time that had passed since the crime as

---

[5] RP (Mar. 23, 2017) at 8536.

evidence that the State had taken the time to charge the right man—even though a significant portion of that time was due to the hung jury in the first trial. In sum, as in *Stith*, the prosecutor's comments struck at the very heart of Bennett's right to a fair trial before an impartial jury and instructions could not have cured the prejudice. Bennett's argument fails.

Unlike in *Stith*, the prosecutor did not violate a limine ruling to introduce prejudicial facts not in evidence or imply that Bennett's guilt had already been determined by probable cause. The prosecutor's point here was that due process was fully satisfied because the trial provided both sides the full opportunity to present their positions to the jury and that the lengthy investigation showed there was no snap judgment decision to arrest the wrong man. That the State considered the right man to have been charged after lengthy investigation was a statement of the obvious, but without personal assurances by the prosecutor that Bennett was guilty.

The prosecutor's comments were a largely appropriate response to Bennett's closing argument that the State was inviting the jury to go along for the ride in a case "based on speculation, supposition, outlandish theorizing, and jumping to conclusions." RP (Mar. 22, 2017) at 8331. The prosecutor calling this the "biggest example" of due process the State has seen was gratuitous hyperbole. But again, unlike in *Stith*, the

58

comment here did not suggest that due process was a safeguard that ensured Bennett's

guilt. He makes no showing that any impropriety in the prosecutor's remarks in response

to Bennett's argument were egregious and could not have been cured by an instruction.

*Cumulative effect of misconduct*

Bennett contends the cumulative effect of the prosecutor's improper arguments

amounts to reversible error. But the cumulative error doctrine "does not apply where the

errors are few and have little or no effect on the outcome of the trial." *State v. Weber*,

159 Wn.2d 252, 279, 149 P.3d 646 (2006). Here, we determined the prosecutor twice

misstated Mr. Bodziak's testimony, but those misstatements were not prejudicial. We

conclude the cumulative error doctrine does not apply.

D.    EXCEPTIONAL SENTENCE

The jury returned special verdict forms finding that Bennett manifested deliberate

cruelty in the commission of second degree murder and Moore was a particularly

vulnerable victim. The trial court imposed an exceptional sentence of 660 months.

Bennett challenges his exceptional sentence on grounds that (1) insufficient

evidence supports the aggravating factors, (2) the aggravating factors are

unconstitutionally vague, and (3) the length of the sentence is arbitrary and excessive.

59

### 1. *Sufficiency of the evidence*

We review whether the record supports the jury's special verdict on the aggravating circumstances under the clearly erroneous standard. *State v. Hale*, 146 Wn. App. 299, 307, 189 P.3d 829 (2008).

A court may depart from the presumptive sentence range if the offense involves substantial and compelling reasons. RCW 9.94A.535. "Aggravating circumstances" that can support a departure from the guidelines include the defendant's conduct "manifested deliberate cruelty to the victim" and the defendant knew or should have known the victim "was particularly vulnerable." RCW 9.94A.535(3)(a), (b).

A jury must find any facts supporting aggravating circumstances beyond a reasonable doubt and by special interrogatory. *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). We use the same standard of review for the sufficiency of the evidence of an aggravating factor as we use for sufficiency of the evidence for the elements of a crime. *State v. Webb*, 162 Wn. App. 195, 205-06, 252 P.3d 424 (2011). Specifically, evidence is sufficient to support the special interrogatory if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the aggravating factor beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

*Deliberate cruelty*. "Deliberate cruelty consists of gratuitous violence or other conduct that inflicts physical, psychological, or emotional pain as an end in itself." *State v. Tili*, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003). To justify an exceptional sentence, the cruelty must go beyond what is normally associated with the commission of the charged offense or what is inherent in the elements of the offense. *Id.* The trial court's jury instruction defined "deliberate cruelty" consistent with these principles.

Bennett contends the deliberate cruelty finding is unsupported by sufficient evidence and must be struck because the State failed to prove gratuitous violence that inflicted pain as an end in itself or that this murder was significantly more egregious than the typical murder. We disagree.

Dr. Eric Kiesel, the forensic pathologist who performed Moore's autopsy, gave testimony describing her injuries and the likely cause of death. He described a number of "injuries, abrasions, contusions on both sides of the head, as well as on the nose, cheek and lips." RP (Feb. 23, 2017) at 5081. Included were multiple significant head injuries that resulted in subarachnoid hemorrhage on both sides of her brain, indicating it had been severely shaken by blunt force trauma. Her maxilla was fractured with force that Dr. Kiesel compared to a boxing injury or car crash. He believed the head injuries were most likely inflicted by fist or hand. Moore also sustained a sharp, incised wound on her

61

right hand, which Dr. Kiesel found consistent with a defensive wound incurred while she was alive. He also found evidence of blunt force injury to her neck. Petechial hemorrhages in both eyes correlated with fractures to the superior horns of the thyroid cartilage, which Kiesel said strongly suggests manual strangulation.

Moore also sustained two sharp force injuries to the throat, which Dr. Kiesel described as incised wounds caused by a sharp instrument. She received another two-inch deep stab wound to the right side of her neck. In addition, she was stabbed 17 times in the chest. Eleven of those wounds penetrated the heart muscle itself. Dr. Kiesel opined that the sharp force injuries, including those to the throat, were most likely inflicted by a knife with about a one-half inch wide blade.

Dr. Kiesel could not be certain of the order in which the injuries were inflicted. He did conclude Moore was on the ground when she received the stab wounds because her shirt was covered with blood but none was on her pants, where blood would have dripped had she been standing. Kiesel said Moore could potentially have died solely from the blunt force trauma to the head but there is no way to say with 100 percent certainty. But she certainly would have died from either the incised wounds to the neck or stab wounds to the heart had there been no other injuries. Kiesel believed Moore was still

alive when she received the stab wounds that went through the fat around the heart and penetrated the heart itself.

Ultimately, while acknowledging the blunt force injuries were a significant part of the total picture, Dr. Kiesel concluded the mechanism of death was most likely loss of blood resulting from the sharp force wounds to the neck and chest. He said bleeding from the neck wounds would have caused her to lose consciousness within 10 to 20 seconds and then it takes a matter of minutes to die. He also opined the injuries inflicted on Moore were in excess of what it takes to kill a person.

Bennett focuses on Dr. Kiesel's testimony that any of Moore's head, neck, or chest injuries could have caused her death—a fact that the prosecutor acknowledged in closing argument and the trial court echoed in its exceptional sentence finding of fact 6. Bennett then points to Dr. Kiesel's testimony that the stab wounds would have caused the victim to lose consciousness in 10 to 20 seconds and the prosecutor's acknowledgment in closing argument that she was "not probably alive for a long time." RP (Mar. 22, 2017) at 8322. He couples this with the testimony of crime scene specialist, Trevor Allen, who said it appeared the victim was knocked down and then stabbed and that the incident appeared to be contained to a very small location without a prolonged struggle. He said, "It didn't seem like there was a long, drawn-out fight." RP (Feb. 22, 2017) at 4881.

63

Bennett uses the above testimony to contrast this case with *State v. Scott*, 72 Wn.
App. 207, 866 P.2d 1258 (1993), *aff'd sub nom. State v. Ritchie*, 126 Wn.2d 388, 894
P.2d 1308 (1995), whereas the State contends *Scott* is analogous and supports the
deliberate cruelty finding. In *Scott*, the victim was elderly, weak, and had diminished
mental capacities. *Scott*, 72 Wn. App. at 214. The court explained:

> Scott could easily have killed her by strangulation, which he did, but only
> after physically and sexually assaulting her. The medical examiner found
> that the manual and ligature strangulation were separate acts of violence.
> The first act of strangulation and/or any of the blows to the victim's head
> were sufficient evidence upon which to base a finding of premeditation. All
> of the other blows to the head, face, and ribs, which occurred in three
> different rooms and resulted in 20 broken bones, were additional violent
> acts separate from the premeditation and the final strangulation.

*Id.* at 214-15. Scott contended his case was unlike cases involving deliberate cruelty due
to prolonged attacks and lingering suffering. *Id*. at 215. The court disagreed:

> [T]he record supports a finding of a prolonged attack by Scott and lingering
> suffering by the victim. It took time to break 20 bones, strangle the victim
> twice, and sexually assault her. The evidence that the assaults occurred in
> three different rooms also suggests a prolonged attack and lingering
> suffering.

*Id.*

Bennett contends the lack of evidence that Moore was subject to prolonged attack
or lingering suffering makes his case like *State v. Brush*, No. 71067-2-I, 2014 WL
1912009 (Wash. Ct. App. May 12, 2014) (unpublished)

64

http://www.courts.wa.gov/opinions/pdf/710672.pdf, *aff'd in part, rev'd in part by* 183

Wn.2d 550, 353 P.3d 213 (2015) and *State v. Serrano*, 95 Wn. App. 700, 977 P.2d 47

(1999), where the courts reversed deliberate cruelty verdicts in similar circumstances.  In

*Brush*, the defendant shot the victim Bonney four times in rapid succession.  2014 WL

1912009 at *1.  At trial, the medical examiner described the homicide as one of the two

worst he had observed in terms of being "'gratuitously violent'" and causing damage in

excess of that necessary to kill someone.  *Id*. at *2.  The jury found deliberate cruelty.  *Id*.

 In reversing the aggravator on appeal as unsupported by the record and therefore clearly

erroneous, the court reasoned:

> [T]the entire incident was over in seconds and the actual shots occurred in
> rapid succession.  Although the first nonlethal shot undoubtedly caused
> Bonney pain, there is no indication that Brush deliberately sought to inflict
> pain as an end in itself or to prolong Bonney's suffering in any way.
> Indeed, the evidence is to the contrary; all of the eyewitnesses suggested
> that he fired the second lethal shot almost immediately after the first.

*Id.* at *6.

In *Serrano*, the defendant was convicted of second degree murder for shooting the

victim in the back five times while he was up in the air in an "orchard ape" (caged

platform) thinning apples.  The trial court found the conduct deliberately cruel and

imposed an exceptional sentence, in part on that factor.  *Serrano*, 95 Wn. App. at 703,

710-11. In holding the deliberate cruelty finding was unsupported by the record and therefore clearly erroneous, this court reasoned:

> Some Washington cases have upheld exceptional sentences on the basis of the number of wounds inflicted. *See, e.g.*, [*State v.*] *Ross*, 71 Wn. App. 556[, 861 P.2d 473 (1993)] (over 100 wounds); *State v. Drummer*, 54 Wn. App. 751, 775 P.2d 981 (1989) (stabbing 20 times); *State v. Harmon*, 50 Wn. App. 755, 750 P.2d 664 (stabbing/slicing 64 times), *review denied*, 110 Wn.2d 1033 (1988). In each of those cases, however, the sheer number of wounds demonstrated a cruelty not usually associated with the offenses. Mr. Serrano shot [the victim] five times. This fact itself does not suggest he gratuitously inflicted pain as an end in itself.

*Id*. at 713.

A majority of this court distinguishes this case from *Brush* and *Serrano* where rapid gun fire suggested a quick death without any gratuitous infliction of pain. Here, viewing the evidence in the light most favorable to the State, the multiple blows to Moore's head, the manual strangulation, the knife slash to her neck, and 17 stab wounds to her chest—including 11 of which pierced her heart—permitted a rational trier of fact to find beyond a reasonable doubt that Bennett gratuitously inflicted pain on Moore. The sheer number and variety of serious injuries inflicted demonstrates a cruelty not usually

associated with the offense.[6] The majority concludes, when viewing the evidence in the light most favorable to the State, a rational trier of fact could find the State proved this aggravating factor beyond a reasonable doubt.

Bennett also contends the State was required to provide the jury with comparative facts of other murder cases to prove the murder was atypical to other murders. His assertion is unsupported by any authority and lacks merit. His cited cases *State v. Suleiman*, 158 Wn.2d 280, 294 n.5, 143 P.3d 795 (2006) and *State v. Faagata*, 147 Wn. App. 236, 249-51, 193 P.3d 1132 (2008), *rev'd on other grounds by State v. Turner*, 169 Wn.2d 448, 238 P.3d 461 (2010), merely reiterate the principle that post-*Blakely*[7] it is the

---

[6] This judge believes the evidence is insufficient for a rational trier of fact to make the required findings beyond a reasonable doubt. The evidence was consistent with the State's theory that Bennett struck Moore multiple times with his fist or an object, attempted to strangle her, then slashed her throat, and stabbed her numerous times in the chest and heart. The location of the knife slash to the throat and the numerous stabs to the chest and heart indicate Bennett sought to kill Moore quickly once he knocked her to the ground. A brief violent attack is inconsistent with inflicting gratuitous fear or pain. The State believed Moore died quickly and did not even argue the injuries occurred in a manner designed to inflict pain as an end in itself. From this evidence, a jury would need to speculate whether the wounds occurred by a brief violent attack or by a methodical series of acts designed to inflict pain as an end in itself. Where the State's evidence requires a jury to speculate rather than make reasonable inferences, the verdict must be overturned. *State v. Hummel*, 196 Wn. App. 329, 357, 383 P.3d 592 (2016). I would reverse the jury's finding of deliberate cruelty and remand for resentencing.

[7] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

jury's role to determine atypicality. The cases do not require the State to present comparative evidence.

*Particularly vulnerable victim*. The trial court instructed the jury that a victim is "particularly vulnerable" if he or she is more vulnerable to the commission of the crime than the typical victim of first or second degree murder, and the victim's vulnerability must also be a substantial factor in the commission of the crime.

Bennett argues the State presented insufficient evidence that Moore's vulnerability was a substantial factor in her murder. He notes that the State's theory of the case, as argued in closing, was that Moore threatened to evict Bennett for being unable to pay rent and this threat caused Bennett to snap. Bennett argues the record conclusively shows Moore's age played no factor at all in his decision to kill her, let alone a substantial factor. He likens his case to *Serrano* and *State v. Barnett*, 104 Wn. App. 191, 16 P.3d 74 (2001).

As stated above, the victim in *Serrano* was in an orchard ape and could not run or protect himself from the gunshots. The trial court imposed the exceptional sentence, in part on a finding of victim vulnerability. *Serrano*, 95 Wn. App. at 710-11. This court reversed because the record did not suggest the victim's vulnerability was a substantial

68

factor in the shooting. *Id.* at 712. Instead, the apparent motive was that the defendant's wife had an affair with the victim. *Id.* at 703 n.1, 710.

In *Barnett*, the defendant committed multiple crimes against his ex-girlfriend. 104 Wn. App. at 194. The court imposed an exceptional sentence in part based on victim vulnerability because she was 17 years old and the defendant waited until she was home alone to initiate the attack. *Id.* at 202. In reversing the aggravator as unsupported by the evidence, this court reasoned the victim was not particularly vulnerable because she led the defendant on a lengthy chase and did not suffer because of age, disability, or ill health. *Id.* at 204. Further, she was not incapacitated by the attack and thereby rendered vulnerable. Instead, she was able to avoid his attempts to stab her and eventually escaped. *Id.* In addition, her being home alone was not the reason the defendant chose her as a victim. He chose her because of their failed relationship, not because she presented an easy target for a random crime. *Id.* at 205.

We disagree with Bennett's implied argument that he could not have snapped *and* decided to kill Moore because she was particularly vulnerable. A person who snaps can decide either to attack the person who made them angry or to walk away in anger. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt: (1) Moore, a woman in her 80s who lived alone,

was more vulnerable to being murdered than a typical person, and (2) her vulnerability was a substantial factor why Bennett murdered her (instead of walking way in anger).

Bennett also contends the State was required to present the jury with comparison evidence of vulnerability from other murder cases. His assertion is unsupported by authority and lacks merit. His cited cases *State v. Vermillion*, 66 Wn. App. 332, 832 P.2d 95 (1992) and *State v. Bedker*, 74 Wn. App. 87, 871 P.2d 673 (1994) contain no such requirement.

### 2. *Vagueness challenge to aggravating factors*

Bennett argues the aggravating factors of "deliberate cruelty" under RCW 9.94A.535(3)(a), and "particularly vulnerable" under RCW 9.94A.535(3)(b) are unconstitutionally vague, both facially and as applied.

The due process clauses of the Fifth and the Fourteenth Amendments to the United States Constitution require that statutes afford citizens a fair warning of prohibited conduct. *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990). The due process vagueness doctrine requires that criminal statutes (1) be specific enough to give citizens fair notice of what conduct is proscribed, and (2) provide ascertainable standards of guilt to protect against arbitrary arrest and prosecution. *Id.*; *State v. Baldwin*, 150 Wn.2d 448, 458, 78 P.3d 1005 (2003). The prohibition against vagueness applies

70

both to statutes defining elements of crimes and to "statutes fixing sentences." *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551, 2557, 192 L. Ed. 2d 569 (2015). Statutes that fix sentences must "specify the range of available sentences" with sufficient clarity. *Beckles v. United States*, __ U.S.__, 137 S. Ct. 886, 892, 197 L. Ed. 2d 145 (2017).

In *Baldwin,* the Washington Supreme Court held: "[D]ue process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines." *Baldwin*, 150 Wn.2d at 459. The court reasoned that sentencing guideline statutes "do not define conduct nor do they allow for arbitrary arrest and criminal prosecution." *Id*. And, "[s]entencing guidelines do not inform the public of the penalties attached to criminal conduct nor do they vary the statutory maximum and minimum penalties assigned to illegal conduct by the legislature." *Id*. The court concluded that the guidelines are intended only to structure discretionary decisions affecting sentences; they do not specify that a particular sentence must be imposed. Since the guideline statutes do not require a certain outcome, they create no constitutionally protectable liberty interest. *Id*. at 461.

At the time of *Baldwin*, the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, authorized judges to impose a sentence outside the standard range based on the judge's finding that there were "substantial and compelling reasons justifying an

71

exceptional sentence." Former RCW 9.94A.120(2) (2000). The judge was required only to provide written findings and conclusions and to base the exceptional sentence on factors not used in computing a standard range sentence. Former RCW 9.94A.120(3); *State v. Gore*, 143 Wn.2d 288, 315, 21 P.3d 262 (2001), *overruled by State v. Hughes*, 154 Wn.2d 118, 131, 110 P.3d 192 (2005). Therefore, the SRA allowed the judge "to impose an exceptional sentence . . . without the factual determinations being charged, submitted to a jury, or proved beyond a reasonable doubt." *Gore*, 143 Wn.2d at 314.

In *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the Court ruled this sentencing scheme unconstitutional. To comply with the Sixth Amendment, the Court held that, except for the fact of a prior conviction, any fact that increases the penalty for a crime must be admitted by the defendant or submitted to a jury and proved beyond a reasonable doubt. A trial court's sentencing authority must be limited to the maximum sentence the court could impose without making any additional findings. *Id.* at 303-04. Under the SRA, such a sentence would be the maximum punishment within the standard range rather than the statutory maximum for the particular crime. *Id.* After *Blakely*, the trial court is allowed to impose an exceptional sentence based on a finding of substantial and compelling reasons. RCW 9.94A.535. But the facts supporting aggravating sentences in RCW 9.94A.535(3) must be proved to a jury, or to

the court if a jury is waived, beyond a reasonable doubt, or by the defendant's stipulation. RCW 9.94A.537(3).

In *Johnson v. United States*, the United States Supreme Court struck down as unconstitutionally vague a provision of the Armed Career Criminal Act of 1984 in 18 U.S.C. § 924(e)(1) that required courts to increase the sentence from a 10-year maximum to a 15-year mandatory minimum for defendants convicted of felon in possession of a firearm with three prior violent felony convictions. *Johnson*, 135 S. Ct. at 2555. *Johnson* ruled that such "statutes fixing sentences" are subject to a vagueness challenge. *Id.* at 2556-57.

In *Beckles*, the United State Supreme Court addressed a vagueness challenge to advisory federal sentencing guidelines. *Beckles*, 137 S. Ct. at 890. The Court observed that vagueness concerns apply to laws that define criminal offenses and that "*fix the permissible sentences* for criminal offenses." *Id.* at 892. The laws "must specify the range of available sentences" with sufficient clarity. *Id.* The Court distinguished *Johnson* because unlike the sentence-fixing statute at issue there, the guidelines did not fix the permissible range of sentences that a trial court must impose. *Id.* Instead, they "merely guide the exercise of a court's discretion in choosing an appropriate sentence

within the statutory range." *Id.* Therefore, the guidelines were not subject to a vagueness challenge under the due process clause. *Id.* at 895.

Recognizing and applying *Beckles*, all three divisions of this court continue to reject due process vagueness challenges to aggravating factors like Bennett's and adhere to *Baldwin* as controlling law. *State v. DeVore*, 2 Wn. App. 2d 651, 413 P.3d 58 (2018) (Division Three), *review denied*, 191 Wn.2d 1005 (2018); *State v. Brush*, 5 Wn. App. 2d 40, 425 P.3d 545 (2018) (Division Two), *review denied*, 192 Wn.2d 1012 (2019); *State v. Lloyd*, 3 Wn. App. 2d 1060, 2018 WL 8642839 (Division One), (unpublished) http://www.courts.wa.gov/opinions/pdf/751115.pdf., *review denied*, 191 Wn.2d 1016 (2018).

In *Devore*, we stated:

> We consider Matthew DeVore's appeal akin to *Beckles v. United States*, not *Johnson v. United States*. The destructive impact factor does not increase the permissible sentence of the offender. The trial court must still sentence the defendant within the statutory maximum of the crime, life imprisonment. Therefore, we hold that challenges to the destructive impact factor *and other aggravating factors under RCW 9.94A.535(3)* do not merit review under the void for vagueness doctrine. We do not then address any vagaries of the aggravating factor.

*DeVore*, 2 Wn. App. 2d at 665 (emphasis added).

In *Brush*, Division Two of this court ruled likewise, rejecting the same arguments Bennett makes and citing to *DeVore*. *Brush*, 5 Wn. App. 2d at 61-63. In the unpublished

74

case, *Lloyd*, Division One also rejected a void for vagueness challenge to the deliberate cruelty and particular vulnerability factors, upholding *Baldwin* and citing *Beckles* as reaffirmation that the aggravating factors merely guide the sentencing court's decision to impose an exceptional sentence. *Lloyd*, 2018 WL 8642839 at *26. In short, the requirements under *Blakely* and RCW 9.94A.535 and .537 that a jury must determine the applicability of certain aggravators does not change the *Baldwin* analysis.

Bennett nevertheless contends *DeVore* and *Brush* misapply *Beckles*. He also contends that in two post-*Blakely* cases, the Washington Supreme Court has signaled its understanding that *Baldwin* no longer applies and aggravators are subject to the prohibition on vague laws because the cases assumed the defendants could bring void for vagueness challenges. *State v. Murray*, 190 Wn.2d 727, 732 n.1, 416 P.3d 1225 (2018); *State v. Duncalf*, 177 Wn.2d 289, 298, 300 P.3d 352 (2013). But the court in those cases determined that "even if we assume" or "even assuming" the vagueness doctrine applies, the defendants' vagueness challenges failed; thus, the court in each case found it unnecessary to address whether *Baldwin* survived *Blakely*. Whatever the Supreme Court's future intent on this issue, it is currently resolved in *DeVore*, *Brush*, and *Lloyd*. The Supreme Court denied review in each of those cases.

*Baldwin* remains good law and applies here. Bennett cannot assert a vagueness

challenge to RCW 9.94A.535(3)(a), (b).

Even assuming Bennett can make his vagueness challenges, he makes no showing

that the deliberate cruelty and victim vulnerability factors are vague as applied to his

conduct.

### 3. *Excessive length of sentence*

Bennett contends the 660-month length of his exceptional sentence for second

degree murder was based on untenable reasons and is arbitrary and excessive.

We review whether a sentence is clearly excessive only for an abuse of discretion.

*Ritchie*, 126 Wn.2d at 392. If the record supports the reasons for the exceptional sentence

and justifies an increased exceptional sentence, we will reverse only if no reasonable

person would have imposed the sentence, i.e., it is based on untenable grounds or

imposed for untenable reasons. *Id.* at 392-93; *State v. Bluehorse*, 159 Wn. App. 410, 434,

248 P.3d 537 (2011). If the trial court does not base its sentence on an improper reason,

such as race or receipt of prison good time credit, this court will not deem the sentence

excessive unless its length, in light of the record, shocks the conscience. *Ritchie*, 126

Wn.2d at 396.

In imposing Mr. Bennett's 660-month sentence, the trial court reasoned:

I do believe there are similarities between the case of *State vs. Scott* and the present matter. And I have attempted to draw some conclusions about how the trial judge reached its decision in that case, considering the heinous facts of that case. And what it appears to me that the trial court did in that case was to first identify a sentence within the higher end of the applicable standard range, and then applied a multiplier of three as a result of the presence of the aggravating factors. And this court believes that that is a reasonable guidance or reasonable instructions [sic] to follow.

So in the present case the standard range is between 134 and 234 months. And based on my analysis, again, of the method used in *State vs. Scott*, Mr. Bennett, your sentence will be 660 months.

RP (May 12, 2017) at 8761.

In *Scott*, the defendant was convicted of first degree murder for raping and killing a 78-year-old woman who suffered from Alzheimer's disease and lived alone. 72 Wn. App. at 209-10. The defendant's standard range was 240 to 320 months. Based on four aggravating factors—abuse of trust, victim vulnerability, deliberate cruelty, and multiple injuries inflicted in the commission of the crime—the trial court imposed an exceptional sentence of 900 months. *Id.* at 210. On appeal, the court affirmed the sentence because it did not shock the conscience, and, although harsh, was not so clearly excessive that no reasonable person would have imposed it. *Id.* at 221-22.

Bennett's 660-month sentence is approximately 2.82 times greater than the 234-month top end of his standard range. Although the sentence is harsh and quite substantial relative to Bennett's standard range, its length does not shock the conscience in light of

77

what the record shows to be a violent murder of a particularly vulnerable 82-year-old woman. Contrary to Bennett's contention, using *Scott* for comparison does not make the court's sentencing decision here untenable. The 660-month sentence is not one that no reasonable person would have imposed.

As the State notes, exceptional sentences of similar magnitude have been affirmed on appeal. *See e.g.*, *Ritchie*, 126 Wn.2d at 399 (upholding 900-month exceptional sentence where standard range was 240 to 320 months); *State v. Van Buren*, 112 Wn. App. 585, 596-601, 49 P.3d 966 (2002) (upholding 600-month sentence for first degree murder where plea agreement recommended 292-month standard range sentence); *State v. Burkins*, 94 Wn. App. 677, 697, 702, 973 P.2d 15 (1999) (upholding 720-month sentence despite 333-month standard maximum); *see also State v. Smith*, 82 Wn. App. 153, 156, 167, 916 P.2d 960 (1996) (upholding 100-year sentence that was 3.1 times the top end of the standard range for attempted first degree murder, robbery, rape, and kidnapping).

Finally, Bennett's assertion of youth as a mitigating factor to lessen his 660-month sentence is without merit. He was two weeks shy of his 25th birthday when he committed the murder. Assuming, at his age, that he could have argued youth as a mitigating factor under *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), he presented no such evidence or argument at sentencing. Youth does not "per se automatically reduce an adult

offender's culpability." *Id.* at 689. For the court to consider it, the "defendant must provide some evidence that youth *in fact* impaired his capacities." *Id.* Bennett did not do so. He steadfastly maintained his innocence all the way through sentencing. The youth factor was appropriately absent from the trial court's sentencing decision.

We conclude the court did not abuse its discretion by imposing the 660-month exceptional sentence.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Korsmo, A.C.J.

_____
Melnick, J.[8]

---

[8] The Honorable Rich Melnick is a Court of Appeals, Division Two, judge sitting in Division Three under CAR 21(a).